Case No. 17-1344

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

**303 CREATIVE LLC** and **LORIE SMITH**,

*Plaintiffs-Appellants,*

v.

**AUBREY ELENIS**, et al.,

*Defendants-Appellees,*

On appeal from the United States District Court
for the District of Colorado
The Honorable Chief Judge Marcia S. Krieger
Case No. 1:16-cv-02372-MSK-CBS

## APPELLANTS' OPENING BRIEF

Kristen K. Waggoner
Jonathan A. Scruggs
Katherine L. Anderson
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org

David A. Cortman
Rory T. Gray
Alliance Defending Freedom
1000 Hurricane Shoals Rd., NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Michael L. Francisco
MRD Law
3301 West Clyde Place
Denver, CO 80211
(303) 325-7843
michael.francisco@mrd.law

*Attorneys for 303 Creative LLC and Lorie Smith*
***Oral Argument is Requested***

December 18, 2017

# Table Of Contents

Corporate Disclosure Statement.............................................................xi

Statement Of Related Appeals...............................................................xii

Introduction...............................................................................................1

Jurisdictional Statement............................................................................2

Statement Of The Issues...........................................................................3

Statement Of The Case .............................................................................5

I.     Lorie Smith...................................................................................5

II.    303 Creative .................................................................................5

III.   Custom Wedding Websites .........................................................7

IV.   The Law.........................................................................................8

V.     Lorie's Lawsuit ..........................................................................10

VI.   The District Court's Order .........................................................11

Summary Of Argument...........................................................................12

Standard Of Review ...............................................................................16

Argument.................................................................................................17

I.     Lorie Has Standing to Challenge the Speech Mandate. ...............17

II.    The District Court Incorrectly Stayed This Case Based on *Masterpiece.* ..................................................................................26

III.   Lorie Deserves a Preliminary Injunction and Summary Judgment Against the Speech Mandate and Publication Ban. ....29

A.  The speech mandate deserves strict scrutiny because it compels speech as-applied. ...................................................30

    1.  Lorie's websites and graphics are pure speech, protected by the First Amendment.............................31

    2.  Lorie objects to the message conveyed by custom websites and graphics promoting same-sex marriage. ......................................................................32

    3.  CADA compels Lorie to design and create objectionable websites and graphics...........................35

    4.  Compelling Lorie to create websites and graphics promoting same-sex marriage compels speech based on content and viewpoint...................................38

    5.  Compelling Lorie to create websites and graphics creates a dangerous and limitless principle. ...............39

B.  The publication ban deserves strict scrutiny because it bans speech based on content and viewpoint, facially and as-applied. ......................................................................42

C.  The speech mandate and publication ban deserve strict scrutiny because they violate Lorie's free exercise rights as-applied. ..............................................................................44

D.  The speech mandate and publication ban deserve strict scrutiny because they violate equal protection as-applied. ..................................................................................49

E.  The speech mandate and publication ban deserve strict scrutiny because they violate the unconstitutional conditions doctrine as-applied. ...........................................50

F.  The speech mandate and publication ban fail strict scrutiny..............................................................................51

G.  The publication ban is vague, overbroad, and allows unbridled discretion. ...........................................................54

H.     Lorie satisfies the remaining factors to obtain a preliminary and permanent injunction. ..............................56

Conclusion ....................................................................57

Oral Argument Statement ......................................................59

Certificate Of Compliance With Rule 32(A) ...........................................60

Certificate Of Digital Submission ...........................................................61

Certificate Of Service ...........................................................62

# Table Of Authorities

## Cases

*ACLU v. Alvarez,*
 679 F.3d 583 (7th Cir. 2012) ........................................................ 23

*ACLU v. Johnson,*
 194 F.3d 1149 (10th Cir. 1999) ..................................................... 57

*Armstrong v. D.C. Public Library,*
 154 F. Supp. 2d 67 (D.D.C. 2001) .................................................. 55

*Awad v. Zirax,*
 670 F.3d 1111 (10th Cir. 2012) ..................................................... 30

*Axson-Flynn v. Johnson,*
 356 F.3d 1277 (10th Cir. 2004) .............................................. 15, 48

*Baker v. Peddlers Task Force,*
 No. 96 Civ. 9472 (LMM), 1996 WL 741616
 (S.D.N.Y. Dec. 30, 1996) ............................................................... 37

*Boy Scouts of America v. Dale,*
 530 U.S. 640 (2000) .............................................................. 40, 51

*Brown v. Entertainment Merchants Association,*
 564 U.S. 786 (2011) ....................................................................... 51

*Burson v. Freeman,*
 504 U.S. 191 (1992) ....................................................................... 51

*Campbell v. Robb,*
 162 F. App'x 460 (6th Cir. 2006) .................................................. 43

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
 508 U.S. 520 (1993) ............................................ 15, 45, 46, 47, 48

*Citizens for Peace in Space v. City of Colorado Springs,*
 477 F.3d 1212 (10th Cir. 2007) ..................................................... 16

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ................................................ 16, 51

*City of Cleburne v. Cleburne Living Center,*
    473 U.S. 432 (1985) ...................................................... 49

*City of Lakewood v. Plain Dealer Publishing Co.,*
    486 U.S. 750 (1988) ...................................................... 32

*City of Revere v. Massachusetts General Hospital,*
    463 U.S. 239 (1983) ...................................................... 24

*Clapper v. Amnesty International,*
    568 U.S. 398 (2013) ................................................ 17, 18

*Clark v. Jeter,*
    486 U.S. 456 (1988) ...................................................... 49

*Cressman v. Thompson,*
    719 F.3d 1139 (10th Cir. 2013) ............................... 18, 20

*Cressman v. Thompson,*
    798 F.3d 938 (10th Cir. 2015) ................................. 31, 33

*D.L. v. Unified School District No. 497,*
    392 F.3d 1223 (10th Cir. 2004) ...................................... 27

*Derma Pen, LLC v. 4EverYoung Ltd,*
    773 F.3d 1117 (10th Cir. 2014) ...................................... 29

*Doe v. Bolton,*
    410 U.S. 179 (1973) ...................................................... 21

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................ 26, 57

*Employment Division, Department of Human Resources*
    *of Oregon v. Smith,*
    494 U.S. 872 ................................................................. 48

*Exxon Mobil Corporation v. Saudi Basic Industries Corporation,*
    544 U.S. 280 (2005) ...................................................... 26

*Felix v. City of Bloomfield,*
    841 F.3d 848 (10th Cir. 2016) ...................................................... 47

*Flood v. ClearOne Communications, Inc.,*
    618 F.3d 1110 (10th Cir. 2010) .................................................... 17

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ...................................................................... 56

*Fox v. Maulding,*
    16 F.3d 1079 (10th Cir. 1994) ........................................ 13, 26, 27

*Holtzman v. Schlesinger,*
    414 U.S. 1316 (1973) .................................................................... 24

*Hurley v. Irish-American Gay, Lesbian and Bisexual*
    *Group of Boston,*
    515 U.S. 557 (1995) .....................................1, 14, 31, 34, 36, 37, 52

*In re Majestic Star Casino, LLC,*
    716 F.3d 736 (3d Cir. 2013)........................................................... 24

*In re Melissa & Aaron Klein dba Sweetcakes by Melissa,*
    Case Nos. 44-14 and 45-14, 2015 WL 4868796
    (Or. BOLI July 2, 2015)................................................................. 56

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ...................................................................... 54

*Landis v. North American Co.,*
    299 U.S. 248 (1936) .......................................................... 26, 27, 28

*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*
    137 S. Ct. 2290 (U.S. June 26, 2017)

*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*
    No. 16-111, 2017 WL 4838416 (Oct. 23, 2017) ................................2

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) .......................................................... 43, 55

*Miami Herald Publishing Co. v. Tornillo,*
418 U.S. 241 (1974) ........................................................ 32, 38, 39

*Miami Valley Fair Housing Center, Inc. v. Connor Group,*
725 F.3d 571 (6th Cir. 2013) ........................................................ 55

*Mink v. Suthers,*
482 F.3d 1244 (10th Cir. 2007) .................................................... 19

*Mitchum v. Foster,*
407 U.S. 225 (1972) .................................................................. 2, 26

*Northern Laramie Range Alliance v. F.E.R.C.,*
733 F.3d 1030 (10th Cir. 2013) .................................................... 23

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
342 F.3d 1170 (10th Cir. 2003) ................................................ 30, 51

*Obergefell v. Hodges,*
135 S. Ct. 2584 (2015) ................................................................ 44

*Pacific Gas & Electric Co. v. Public Utilities Commission of California,*
475 U.S. 1 (1986) ........................................................ 30, 32, 38, 39

*Perry v. Sindermann,*
408 U.S. 593 (1972) ................................................................ 15, 50

*Petrella v. Brownback,*
787 F.3d 1242 (10th Cir. 2015) .................................................... 17

*Phelps v. Hamilton,*
59 F.3d 1058 (10th Cir. 1995) ...................................................... 27

*Plyler v. Doe,*
457 U.S. 202 (1982) .................................................................... 49

*Prairie Band Potawatomi Nation v. Wagnon,*
476 F.3d 818 (10th Cir. 2007) ...................................................... 30

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) .................................................................... 43

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ................................................................ 42

*Riley v. National Federation of the Blind of North Carolina,*
    487 U.S. 791 (1988) ............................................................ 32, 38

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) ............................................................ 36, 37

*Robinson v. Crosby,*
    358 F.3d 1281 (11th Cir. 2004) ........................................ 28, 29

*Rosenberger v. Rectors & Visitors of University of Virginia,*
    515 U.S. 819 ................................................................................. 42

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ...................................................................... 43

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ...................................................... 55

*Seaview Trading, LLC v. Commissioner of Internal Revenue,*
    858 F.3d 1281 (9th Cir. 2017) .................................................. 24

*Span-English Associates v. Weidner,*
    771 F.2d 464 (10th Cir. 1985) .......................................... 27, 28

*Sprint Communications, Inc. v. Jacobs,*
    134 S. Ct. 584 (2013) ................................................................. 26

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ............................................................ 13, 17

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014) ............................................................... 18

*Telescope Media Group v. Lindsay,*
    No. 0:16-cv-04094, 2017 WL 4179899
    (D. Minn. Sept. 20, 2017) ......................................................... 21

*Telescope Media Group v. Lindsey,*
    No. 17-3352 (8th Cir. Dec. 6, 2017) ....................................... 29

*Turner Broadcasting System, Inc. v. F.C.C.,*
    512 U.S. 622 (1994) ........................................................... 36

*United States v. Stevens,*
    559 U.S. 460 (2010) ........................................................... 55

*Vejo v. Portland Public Schools,*
    204 F. Supp. 3d 1149 (D. Or. 2016)................................... 53

*Verlo v. Martinez,*
    820 F.3d 1113 (10th Cir. 2016) ......................... 26, 28, 57

*Virginia v. American Booksellers Association, Inc.,*
    484 U.S. 383 (1988) ................................................ 19, 21

*Ward v. Utah,*
    321 F.3d 1263 (10th Cir. 2003) ................... 17, 18, 19, 20

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943) ................................. 13, 35, 41, 42

*Wilson v. Stocker,*
    819 F.2d 943 (10th Cir. 1987) ........................................ 17

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ........................................................... 30

*World Peace Movement of America v. Newspaper Agency
    Corporation,*
    879 P.2d 253 (Utah 1994)................................. 34, 53, 54

*Yes On Term Limits, Inc. v. Savage,*
    550 F.3d 1023 (10th Cir. 2008) ...................................... 51

## Regulations

29 C.F.R. § 1604.2 ................................................................... 53

### Statutes

28 U.S.C. § 1292(a)(1)...............................................................2

28 U.S.C. § 1331 ......................................................................2

28 U.S.C. § 1343 ......................................................................2

42 U.S.C. § 2000b ...................................................................53

42 U.S.C. § 2000e-2(e)(1).......................................................53

Colo. Rev. Stat. § 24-34-601(2)(a).............................. 7, 8, 42, 54

### Other Authorities

Popularity of name, Social Security Administration,
　　https://www.ssa.gov/cgi-bin/babyname.cgi. ...................22

Wedding Lovely Blog, (Nov. 17, 2017),
　　https://weddinglovely.com/blog/top-five-wedding-website-
　　builders/ ......................................................................52

Gay + Lesbian Weddings, The Knot, https://www.theknot.com/gay-
　　lesbian-weddings .........................................................52

Tanya Singh, A History of Art Commissions (April 22, 2017),
　　https://www.art-mine.com/collectorscorner/history-art-
　　commissions/.................................................................37

Eugene Volokh, Printing Business's Right Not to Print Messages
　　it Doesn't Want to Print, (Nov. 2, 2015),
　　https://www.washingtonpost.com/news/volokh-
　　conspiracy/wp/2015/11/02/printing-businesss-right-not-to-
　　print-messages-it-doesnt-want-to-
　　print/?utm_term=.deca2442619c ...................................40

## Corporate Disclosure Statement

Plaintiffs 303 Creative LLC and Lorie Smith, by and through counsel, and pursuant to Federal Rule of Civil Procedure 7.1, hereby state as follows:

303 Creative LLC is a limited liability company. It issues no stock and has no parent corporation.

## Statement Of Related Appeals

There are no earlier or related appeals.

## Introduction

Plaintiff-Appellant Lorie Smith[1] is a web designer who creates promotional websites for people regardless of who they are; she merely seeks the freedom to "choose the content" of the websites she creates. *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995). The First Amendment guarantees her that freedom.

Yet, Defendant-Appellees ("Colorado") oppose that freedom, insisting that the Colorado Anti-Discrimination Act ("CADA") requires Lorie to create wedding websites promoting same-sex marriage if she creates wedding websites promoting opposite-sex marriage. To justify this compulsion, Colorado claims that Lorie loses editorial control over her expression because she creates speech for a living. By entering the marketplace, says Colorado, Lorie gives up and leaves her free speech rights behind.

But no precedent or principle justifies this newly minted rule. There is no commissioned speech exception to the First Amendment. Worse still, Colorado applies its exception only to certain topics (same-sex marriage), certain views (that marriage is between one man and one woman), and certain religious adherents (those who believe in one man/one woman marriage). But public accommodation laws like CADA do not trump the Constitution; and states cannot play favorites among

---

[1] Unless context dictates otherwise, references to "Lorie" refer to both Plaintiff-Appellants.

differing views on marriage. When they do, federal courts must interpose themselves "as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law …." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

But when Lorie sought this protection, the district court declined to rule—dismissing some of her claims despite clear evidence of standing, and staying other claims until the U.S. Supreme Court rules in *Masterpiece Cakeshop v. Colorado Civil Rights Commission, cert. granted,* 137 S. Ct. 2290 (U.S. June 26, 2017) (No. 16-111) (argued Dec. 5, 2017) ("Masterpiece").

The district court's ruling was incorrect. Lorie has not published certain website content because Colorado will punish her if she does. She has chilled her speech for fifteen months already and *Masterpiece* may not resolve her case. She suffers irreparable harm every day and will continue to do so. This Court should stop that harm.

## Jurisdictional Statement

The district court had jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343 because Lorie raises First and Fourteenth Amendment claims. Aplt. App. 16 at ¶¶ 16-19. This Court has jurisdiction to review this appeal under 28 U.S.C. § 1292(a)(1) because the district court's Order expressly, and in practical effect, denied injunctive relief. Parts of the Order are also appealable under pendent appellate jurisdiction because they are inextricably intertwined with the denial of injunctive relief.

Lorie filed a notice of interlocutory appeal on September 28, 2017, from the district court's Order filed on September 1, 2017, denying injunctive relief. Notice of Appeal, ECF No. 53.

## Statement Of The Issues

1. *Standing*. Does Lorie have standing to challenge a provision of CADA that compels her to create websites promoting same-sex marriage and that prohibits her from creating websites promoting opposite-sex marriage when Colorado currently defends and has already applied this provision to compel businesses to create speech promoting same-sex marriage?

2. *Stay*. Did the district court properly stay Lorie's challenge to a CADA provision that bans her from posting a statement on her website pending the Supreme Court's decision in *Masterpiece* when that case involves different parties, when Lorie is suffering ongoing irreparable harm, when *Masterpiece* may not be decided for six months, and when *Masterpiece* may not resolve Lorie's case?

3. *Compelled Speech*. Does CADA violate the First Amendment as-applied when it requires a for-profit web designer like Lorie to create wedding websites promoting same-sex marriages even though she objects to the message conveyed by those websites?

4. *Content- and Viewpoint-Based Prior Restraint*. Does CADA violate the First Amendment as-applied when it bans Lorie from posting a statement on her website discussing her religious beliefs about

marriage and her business because of the message contained in that statement?

5.  *Free Exercise*. Does CADA violate the First Amendment as-applied by forcing Lorie, contrary to her religious beliefs, to create custom websites promoting same-sex marriage when other expressive businesses freely decline projects based on their beliefs and when state officials apply CADA based on animus towards the religious belief that marriage is a union between one man and one woman?

6.  *Equal Protection*. Does CADA violate equal protection as-applied when it forces Lorie to create messages promoting same-sex marriage that she objects to, yet allows other expressive businesses to freely decline messages critical of same-sex marriage that they object to?

7.  *Unconstitutional Condition*. Does CADA violate the unconstitutional conditions doctrine as-applied when it conditions the benefit of earning a living on Lorie forfeiting her free speech, free exercise, and equal protection rights?

8.  *Overbreadth, Vagueness, Unbridled Discretion*. Is one CADA provision facially invalid under the overbreadth, vagueness, and unbridled discretion doctrines because it bans speech that may indicate a person is "unwelcome, objectionable, unacceptable, or undesirable" based on a protected status?

## Statement Of The Case

### I.   Lorie Smith

Lorie Smith's passion for art and graphic design started young. Aplt. App. 27 (¶ 101). She developed talents in graphic and web design while pursuing a marketing degree at University of Colorado Denver and began a career in that field. Aplt. App. 262 (¶ 40).[2]

After years of working for traditional companies, Lorie decided to start her own business to freely use her skills to promote messages aligned with her beliefs. Aplt. App. 262-63, 265 (¶¶ 37-42, 60). As a devout Christian, Lorie strives to live by her faith, which teaches that every talent comes from God and must be used consistent with His teachings. Aplt. App. 261-62, 265 (¶¶ 30-38, 60). So Lorie started 303 Creative seeking creative freedom. Aplt. App. 263 (¶ 42).

### II.   303 Creative

Through 303 Creative, Lorie offers to create website and graphic designs to the public. *Id.* (¶45). She does all the work herself, and she alone controls the scope, mission, priorities, creative services, and standards of each 303 Creative project. Aplt. App. 263-64 (¶¶ 48-49, 58). Each of Lorie's website and graphic designs are original and custom. *Id.* (¶¶ 50, 58). No two projects are the same, and all are expressive in nature, containing images, words, symbols, and other modes of expression that

---

[2] The verified complaint and stipulated facts substantially overlap so for simplicity some citations are only to the stipulated facts.

Lorie uses to communicate a particular message. Aplt. App. 263, 268 (¶¶ 46-47, 81).

When Lorie accepts any creative project, she works closely with her clients to share ideas and to collaborate to develop a website and graphics that express a message that is pleasing to both. Aplt. App. 264 (¶ 57). Yet, Lorie has the ultimate say over what she does and does not create and over the designs she does and does not use for each website. *Id.* (¶ 58). Although her clients often have a basic idea of what they want for a graphic or website, Lorie uses her creative skills to transform her clients' ideas into compelling graphics or websites that communicate the intended message. *Id.* (¶¶ 54-56). It is Lorie's personal inspiration, sense of beauty, and attention to artistic principles, such as color schemes, fonts, sizes, positioning, harmony, balance, proportion, scale, space, interactivity, movement, navigability, and simplicity, that create the final product. *Id.* (¶¶ 51-58). Each creation bears her "Designed by 303 Creative" mark so that everyone knows who devised it. Aplt. App. 268 (¶83).

Lorie's faith often inspires her creative works. Aplt. App. 265 (¶¶ 60-62). Because of this, she can only create messages—through artwork, graphics, or text—consistent with her faith. Aplt. App. 265-67 (¶¶ 60-72). For example, Lorie cannot create messages that contradict biblical truth, demean or disparage others, promote sexual immorality, support the destruction of unborn children, incite violence, or promote any concept of

marriage other than between one man and one woman. Aplt. App. 266 (¶ 66).

## III.   Custom Wedding Websites

Lorie's faith inspires her existing work and motivates her to expand her creative services into new areas, including custom wedding websites. Aplt. App. 267-68 (¶¶ 71-80). Lorie believes that God's design for marriage is perfect and beautiful. *Id.* She wants to use her talents to convey that beauty. *Id.* Creating custom wedding websites and graphics gives Lorie the opportunity to support new marriages and promote the biblical view of marriage. *Id.*

Lorie witnessed the cultural redefinition of marriage with dismay. *Id.* She has seen the debate on the topic and wants to take part in that public dialogue. *Id.* Her faith demands as much. Aplt. App. 265, 267-68 (¶¶ 60-62, 71-80). As a Christian, Lorie believes she has a duty to express her faith publicly so that others will come to understand and appreciate Christian views, including those on marriage. *Id.*

So in 2016, Lorie prepared (but because of CADA did not publish) an addition to 303 Creative's website announcing the expansion of her services to custom wedding websites. Aplt. App. 268-69, 305-09 (¶¶ 84-87, Ex. B). This new webpage explains Lorie's vision for designing custom wedding websites as an effort "to explain His true story about marriage and … to publicly proclaim and celebrate His design for marriage as a

life-long union between one man and one woman." Aplt. App. 269, 305-09 (¶¶ 88-91, Ex. B).

Lorie's wedding websites are just as artistic, expressive, and customized as her other design work. Aplt. App. 268 (¶ 81). Promoting a competing concept of marriage would violate her deeply held religious beliefs. Aplt. App. 269-70 (¶ 90, 94). To be open and transparent about this, Lorie adds the following explanation to her proposed webpage addition:

> These same religious convictions that motivate me also prevent me from creating websites promoting and celebrating ideas or messages that violate my beliefs. So I will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman. Doing that would compromise my Christian witness and tell a story about marriage that contradicts God's true story of marriage—the very story He is calling me to promote.

Aplt. App. 269 (¶¶ 90-91). Lorie desires to immediately publish this webpage announcing her new offerings. *Id.*

## IV. The Law

Lorie has not launched her webpage, however, or begun creating wedding websites because of CADA. Aplt. App. 270 (¶¶ 93-97); Aplt. App. 35-37 (¶¶ 165-180). CADA makes it illegal to

> publish … any … communication … that indicates that the full and equal enjoyment of the … services … of a place of public accommodation will be refused, withheld from, or denied … or that an individual's patronage or presence … is unwelcome, objectionable, unacceptable, or undesirable because of … sexual orientation ….

Colo. Rev. Stat. § 24-34-601(2)(a) ("publication ban"/"communication clause"); Aplt. App. 257 (¶ 3). CADA also makes it

> unlawful for a person, directly or indirectly, to refuse, withhold from, or deny … because of … sexual orientation … the full and equal enjoyment of the … services … of a place of public accommodation…

Colo. Rev. Stat. § 24-34-601(2)(a) ("speech mandate"/"accommodation clause"); Aplt. App. 256 (¶1).

While Lorie does not discriminate against anyone, she learned that Colorado interprets CADA to force Christian business owners to create messages that contradict their religious beliefs. Aplt. App. 265, 270 (¶¶ 64-65, 93-97); Aplt. App. 35-37 (¶¶165-180). This is clear in Colorado's actions against the Colorado cake designer, Jack Phillips. Aplt. App. 260, 310-339 (¶ 25, Ex. C-F); Aplt. App. 21-25 (¶¶ 61-90).

Phillips declined to create a custom wedding cake celebrating a same-sex wedding because of his Christian beliefs about marriage. *Id.* Like Lorie, Phillips serves all customers but cannot promote all messages. Aplt. App. 260, 265-66, 310-339 (¶¶ 25, 64-66, Ex. C-F); Aplt. App. 22-23 (¶¶ 63-76). Nevertheless, Colorado found that he violated CADA, engaged in sexual orientation discrimination, and ordered him to create artistic cakes that violate his beliefs, to re-educate his staff (mostly family members) that his views about marriage are wrong, and to file reports with Colorado about his future artistic decisions. Aplt. App. 260, 310-339 (¶ 25, Ex. C-F).

Around the same time, Colorado received creed discrimination complaints against three bakeries (Azucar Bakery, Le Bakery Sensual, and Gateaux) that refused to create custom cakes expressing religious messages critical of same-sex marriage. Aplt. App. 261, 340-63 (¶ 28, Ex. G-L); Aplt. App. 23-25 (¶¶ 77-85). In each case, Colorado found no probable cause of discrimination because (1) the bakeries declined the projects because they objected to the cake's message, and (2) the bakeries served Christians generally. *See id.* Colorado reached this conclusion even though Phillips also objected to the cake's message and serves LGBT persons generally. Aplt. App. 260-61, 310-63 (¶¶ 25, 28, Ex. C-L); Aplt. App. 21-25 (¶¶ 61-90). His case is currently pending before the U.S. Supreme Court.

## V. Lorie's Lawsuit

After seeing that Colorado applies CADA to compel creative professionals to promote a vision of marriage that conflict with their faith, Lorie decided the risk was too great: she did not publish her new website and did not begin creating custom wedding websites. Aplt. App. 257-59, 270 (¶¶ 4-18, 94-97).

But Lorie realized that she could not stay silent about biblical marriage's unique beauty and religious value. Aplt. App. 265, 267-68 (¶¶ 60-62, 71-80). So Lorie filed this lawsuit and simultaneously moved for a preliminary injunction. Aplt. App. 365. She challenged CADA's speech mandate because it compels her to create objectionable messages and

CADA's publication ban because it bars her from publishing her desired website. Aplt. App. 270 (¶¶ 95-96); Aplt. App. 35-37 (¶¶ 165-180).

## VI. The District Court's Order

Lorie urged the court below to rule quickly. Aplt. App. 186 (11:4-7) ("There's irreparable harm going on right now with her chilling of her speech, so we would urge the Court to make a decision quickly."). Colorado responded with a motion to dismiss, confirming Lorie's fears about CADA. Defs.' Resp. to Pls.' Mot. for Prelim. Inj. 2, 6, ECF No. 38 ("Defs.' MPI Resp.") (characterizing Lorie's efforts to live out her faith as "seek[ing] … permission to discriminate … in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); *Id*. at 18 (characterizing the belief that marriage is a union between one man and one woman as a "derogatory, offensive message"); Defs'. Resp. to Pls.' Mot. for Summ. J. and Mem. in Support 27-28, ECF No. 50 ("Defs.' MSJ Resp.") (same).

After full briefing, the district court held a hearing on the motions to dismiss and for preliminary injunction but declined to rule on them, instructing Lorie to file for summary judgment. Aplt. App. 172, 174, 187-188 (12:23-13:2). Almost nine months later, the court issued its Order deciding all three motions together on the same record. Aplt. App. 364-76.

This Order expressly denied Lorie's preliminary injunction and summary judgment motions and denied in part and granted in part

Colorado's motion to dismiss, ruling that Lorie lacked standing to challenge the speech mandate but had standing to challenge the publication ban. Aplt. App. 374 ("Plaintiffs have standing only to pursue claims challenging the Communication Clause that arise from publication of the Proposed Statement. They lack standing to assert claims challenging the Accommodation Clause …."). The Order also stayed any merits decision until the U.S. Supreme Court rules on *Masterpiece*. Aplt. App. 375-76.

## Summary Of Argument

Lorie serves all people. She just cannot convey all messages. Because of her religious views on marriage, she cannot proclaim or celebrate any vision of marriage other than one between one man and one woman. At the same time, Lorie's faith requires her to use her talents to express and explain her faith. She wants and has prepared to do this by creating custom wedding websites and by publishing a statement announcing her new business and explaining her religious views.

But that statement has stayed under wraps because if Lorie publishes it or begins creating custom wedding websites and does not create similar websites for same-sex marriages, Colorado will punish her. Colorado has already enforced CADA in this manner against another expressive business and claimed the power to enforce CADA in this way against Lorie. Aplt. App. 260, 310-339 (¶ 25, Ex. C-F); *see also* Defs.' MSJ Resp. 28 (characterizing Lorie's speech as "discriminat[ing] against same

sex couples on the basis of [her] religious beliefs" in violation of CADA); Defs.' MPI Resp. 2, 6, 18 (same).

No one denies that Colorado will enforce CADA's speech mandate and publication ban against Lorie. These two provisions, therefore, deter Lorie's desired expression. She need not wait for the hammer to drop to challenge these provisions. A credible threat of enforcement is enough when speech is chilled. And Colorado's prior actions and current litigation position make that threat beyond credible. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (noting that litigant need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that [s]he claims deters the exercise of constitutional rights").

Despite this chilling injury, the district court stayed Lorie's challenge to CADA's publication ban until a decision in *Masterpiece*. But *Masterpiece* involves different litigants, different speech, and some different as-applied claims. *Masterpiece* may resolve Lorie's case. It may not. No one knows for sure. But we do know that Lorie suffers ongoing irreparable harm as she self-censors her speech rights. In these circumstances, the federal courts should exercise their "virtually unflagging" duty to resolve the merits of this case. *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994).

Moving to the merits, the government may not "compel [an individual] to utter what is not in his mind." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). Doing so interferes with "the

fundamental rule of protection under the First Amendment" that each speaker has "the autonomy to choose the content of [her] own message." *Hurley*, 515 U.S. at 573.

Yet Colorado interprets CADA's speech mandate to force Lorie to create custom wedding websites (pure speech) promoting same-sex marriages if she creates custom wedding websites for any marriage. Colorado also applies this provision in a content- and viewpoint-based way: whether Lorie must create undesired speech depends on the content of her prior speech, and CADA changes the content of Lorie's websites by forcing her to create messages she objects to. The First Amendment prohibits this.

CADA's publication ban is also content- and viewpoint-based. It only bans critical speech. Affirming same-sex marriage is ok. Opposing it is not. Indeed, a person may not say anything that indicates someone is "unwelcome, objectionable, unacceptable, or undesirable because of" a protected characteristic. According to Colorado, Lorie's desired statement about marriage does just that. Such content- and viewpoint-discrimination goes too far.

So too does the burden on Lorie's religious beliefs. Preventing Lorie from speaking about her religious beliefs and forcing her to create speech against those beliefs violates free exercise. In application, CADA is not neutral or generally applicable. Colorado enforces CADA to create a religious gerrymander, targeting only the religious belief in one man/one

woman marriage. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). This is evident from past enforcement: Colorado punished one bakery for declining to create a cake promoting same-sex marriage but exonerated three other bakeries after they declined cakes criticizing same-sex marriage. Aplt. App. 260-61, 310-63 (¶¶ 24-28, Ex. C-L). This inconsistency highlights Colorado's underinclusive enforcement and use of individualized exemptions to target particular beliefs. *Lukumi*, 508 U.S. at 546. Because CADA simultaneously violates Lorie's speech rights, CADA's application also triggers the hybrid-rights doctrine and triggers strict scrutiny. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295-97 (10th Cir. 2004).

CADA's unequal treatment of religious beliefs also violates equal protection. Persons similarly situated should be treated alike. Yet, while Lorie is similarly situated to the three bakeries—all four serve everyone, and all four decline objectionable messages—only Lorie faces punishment under CADA.

In this way, Colorado conditions Lorie's ability to operate her business on her willingness to give up her constitutional rights to free speech, free exercise, and equal protection. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). States cannot condition a benefit on the loss of constitutional rights in an attempt to do indirectly what they cannot do directly. *Id.*

In addition to these as-applied problems, CADA's publication ban has facial problems. This provision turns on whether Colorado deems speech to indicate persons are "unwelcome, objectionable, unacceptable, or undesirable because of" a protected characteristic. But these subjective terms provide no guidance to government officials enforcing the law or speakers wanting to speak. The terms, therefore, violate the overbreadth, vagueness, and unbridled discretion doctrines.

Each of the above constitutional violations triggers strict scrutiny. *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997). Colorado cannot pass that test. Colorado cannot show that compelling one web designer to create undesired speech and to forgo desired speech satisfies a compelling state interest in a narrowly tailored way. *Id.* In contrast, compelling and banning Lorie's speech causes irreparable harm and harms both the public interest and equity. Not only Lorie, but everyone wins when speakers can choose what messages they can and cannot say.

## Standard Of Review

The standard of review is de novo. This Court reviews legal conclusions denying a preliminary injunction de novo. And while this Court typically reviews factual findings for clear error, "[i]n a First Amendment case … we review the district court's findings of fact and its conclusions of law de novo." *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007). The same de novo review applies to motions to dismiss grants and appealable summary judgment

denials. *Petrella v. Brownback*, 787 F.3d 1242, 1256-57 (10th Cir. 2015); *Flood v. ClearOne Comm'n, Inc.*, 618 F.3d 1110, 1117-18 (10th Cir. 2010).

## Argument

### I.    Lorie Has Standing to Challenge the Speech Mandate.

Lorie cannot exercise her First Amendment rights to publish her desired website or to create custom wedding websites because of CADA. That gives her standing.

As the court below recognized, Lorie need not "first expose [her]self to actual arrest or prosecution to be entitled to challenge a statute that [s]he claims deters the exercise of [her] constitutional rights." *Steffel*, 415 U.S. at 459; *see also* Aplt. App. 371. She must establish (1) redressability, (2) causation, and (3) injury in fact by showing (a) a credible threat of enforcement and (b) either an intent to engage in a course of conduct, arguably protected by the constitution but prescribed by statute, or a chilling effect on her speech. Aplt. App. 369-74 (stating test); *Ward v. Utah*, 321 F.3d 1263, 1267-69 (10th Cir. 2003) (establishing "intent to engage" test); *Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987) (stating "chilling effect" test). The only element the district court denied was a credible threat of enforcement under the speech mandate. Aplt. App. 372-74. But that ruling misapplied the test and misunderstood the record.

As for the test, the district court denied standing because of *Clapper v. Amnesty International*, even though the law and facts of *Clapper* do not

apply here. 568 U.S. 398 (2013); Aplt. App. 371-74. Legally, *Clapper* involved a national security statute that triggered an "especially rigorous" "standing inquiry" specific to the type of statute challenged— not applicable to CADA. *Clapper*, 568 U.S. at 408. Factually, the *Clapper* court denied standing because the challenged statute exempted the plaintiffs, the plaintiffs did not facially violate the statute, and if they had, the statute still required a five-step discretionary process before surveillance could occur. *Id.* at 410. None of that uncertainty applies here.

More relevant than *Clapper* is *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014) ("*SBA List*"). There the Supreme Court found pre-enforcement standing for advocacy groups to challenge a law that criminalized false statements about candidates during political campaigns because the law chilled their speech. *Id.* at 2341-46. Its analysis tracks this circuit's cases in *Cressman v. Thompson*, 719 F.3d 1139, 1147 (10th Cir. 2013) (*Cressman I*) and *Ward*, 321 F.3d at 1269-70, that found credible threats of enforcement based on a chilling effect on speech. *Cressman I*, 719 F.3d at 1147 (finding pre-enforcement standing); *Ward*, 321 F.3d at 1269-70 (same).

These cases properly applied the more lenient standing analysis appropriate to First Amendment pre-enforcement challenges. *Id.;* *Cressman I*, 719 F.3d at 1147. As many courts have recognized, the credible threat of enforcement test demands the least when, as here, the

plaintiffs' injury is the "chilling effect on [her] desire to exercise [her] First Amendment rights." *Ward*, 321 F.3d at 1266-67; *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.").

When a statute bars and chills speech, as the district court found here, there is "a credible threat of prosecution" "absen[t] … compelling contrary evidence." *Ward*, 321 F.3d at 1269 (quotation omitted). "Compelling contrary evidence" exists only when the state defendants clearly deny an intent to enforce the law against an individual plaintiff. *See Mink v. Suthers*, 482 F.3d 1244, 1255 (10th Cir. 2007) (collecting cases establishing this rule).

Colorado has made no such denial. Quite the contrary. Colorado has vigorously defended its authority to apply CADA against Lorie if she speaks as desired. For example, Colorado admitted below that the state *must* investigate any and all charges of discrimination or unfair practice against Lorie once they receive a complaint related to either her desired statement or wedding website business. Aplt. App. 184 (9:5-7) (Colorado "has *no discretion* whether it could accept a complaint as long as it is filed.") (emphasis added).

Colorado labeled Lorie's religious views about marriage "derogatory, and offensive message[s]." Defs.' MPI Resp. 18. Additionally, Colorado interprets Lorie's efforts to live and work in accordance with

her religious beliefs as "seek[ing] … permission to discriminate" and "assert[ing] her religious beliefs as a reason to discriminate" under CADA. *Id.* at 2, 6. So Colorado leaves no doubt that it interprets CADA to prohibit Lorie's desired speech.

This puts Lorie's case directly in line with *Cressman I* and *Ward*, where this Court found a credible enforcement threat because speech was chilled, prescribed by statute, and the state never promised to forgo enforcement. *Cressman I*, 719 F.3d at 1147; *Ward*, 321 F.3d at 1269-70.

Ignoring this point, the district court focused on alleged events that must occur before Lorie violates the law, such as Lorie launching her wedding website business, receiving a wedding website request, and declining that request. Aplt. App. 372-74. But Lorie alone controls whether she launches her wedding website business and declines to create a same-sex wedding website; and she has sworn to do both immediately if not for CADA. Aplt. App. 268-70 (¶¶ 85-97). In every pre-enforcement speech case, the speaker controls whether to speak and to refrain from doing so. That decision does not negate standing; it establishes the injury required for standing.

Nor does a lack of a wedding website request change the analysis. *Id.* Standing does not rise or fall on a third party's request for speech.

First, Colorado itself has independent authority to file charges alleging discrimination or unfair practice that they believe "imposes a significant societal or community impact." Aplt. App. 258 (¶ 7).

Investigation is then mandatory. *Id.* (¶ 8); *see also* Aplt. App. 184 (9:5-7). In this respect, Colorado has the power to investigate and enforce without receiving any third party request.

Second, as *Doe v. Bolton* shows, plaintiffs may challenge a law *directed at them* before enforcement, whether or not they have received a request for services that would cause them to violate the law. 410 U.S. 179, 188 (1973) (finding standing for physicians to challenge abortion statute even though they could not violate the law absent a third party request to perform an abortion); *see also Am. Booksellers*, 484 U.S. at 392-93 (finding injury-in-fact because "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution"); Mem. Op. and Order at 13-18, *Telescope Media Group v. Lindsay*, No. 0:16-cv-04094-JRT-LIB, 2017 WL 4179899 (D. Minn. Sept. 20, 2017), ECF No. 53 (finding standing to challenge similar speech mandate and summarizing cases finding same).

CADA is directed at 303 Creative as a public accommodation. Aplt. App. 257, 270 (¶¶ 2, 93). Colorado repeatedly confirmed its intent to enforce CADA to stop Lorie from declining to create custom speech celebrating a same-sex wedding ceremony. CADA also regulates Lorie's speech. So she faces a credible threat of enforcement even without a third-party request. The district court never addressed the case-law on this point.

Third, while a request is not necessary for standing, Lorie received one. On September 21, 2016, Lorie received an inquiry through her webpage asking her to create custom graphics and a website for a same-sex wedding:

> My name is Stewart and my fiancée is Mike. We are getting married early next year and would love some design work done for our invites, placenames, etc. We might also stretch to a website.

Aplt. App. 203-04. The inquiry was sent by stewcurran@gmail.com. Lorie did not respond.

While the district court considered the request, it regarded the request as imprecise because "it is not clear that Stewart and Mike are a same-sex couple (as such names can be used by members of both sexes) and it does not explicitly request website services." Aplt. App. 373. Both rationales are wrong.

Although the request hedges on a website, it clearly seeks custom graphics for a wedding. Designing custom graphics to celebrate a same-sex wedding violates Lorie's beliefs and is speech just as much as creating a custom wedding website. Aplt. App. 265, 268 (¶¶ 63, 81).

In addition, both Stewart (Stew) and Mike are traditionally male names. *See e. g.,* Popularity of name, Social Security Administration, https://www.ssa.gov/cgi-bin/babyname.cgi. "Stewart" was not listed among the top 1000 girls' names at any time in the last century. *Id.* Michael was the most or second most popular boys' name from 1954 to 2008, and remains in the top ten boys' names. *Id.*

On the district court's theory, Lorie had to do a genetic test on the requesters to establish enough certainty for standing. But standing is not so stringent. "Preenforcement suits always involve a degree of uncertainty about future events." *ACLU v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012). At the summary judgment stage, preponderance of the evidence is enough. *N. Laramie Range All. v. F.E.R.C.*, 733 F.3d 1030, 1034 (10th Cir. 2013). And Lorie meets that standard because it is more likely than not that Mike and Stewart are men who contacted Lorie for custom graphics celebrating their same-sex wedding. Aplt. App. 203-04.

Nor could Lorie do any more to verify the requestors' identity without violating CADA. If she called the requestors and asked about their request, they surely would have repeated their request, thereby forcing Lorie to decline on the spot and violate CADA.

Moreover, this request came when Lorie was not even offering wedding websites. If Lorie received requests related to same-sex marriages before starting or advertising her wedding business, she will surely receive such requests once she publishes her webpage addition. Additionally, the district court found that a future complaint under the publication ban was likely "[g]iven the public interest in and legal disagreement that is evidence in *Masterpiece*…." Aplt. App. 372. But the same logic holds for complaints related to CADA's speech mandate. The district court's analysis lacks consistency.

This inconsistency becomes worse because the district court found standing for Lorie to challenge CADA's publication ban but not its speech mandate. Aplt. App. 375-76. That result, however, was incorrect because the two challenges are intertwined.

The U.S. Supreme Court has recognized that there exists a class of cases "where standing and the merits are inextricably intertwined." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243 n.5 (1983) ("[B]oth the standing question and the merits depend in part on whether injured suspects will be deprived of their constitutional right to necessary medical care...."); *see also Holtzman v. Schlesinger*, 414 U.S. 1316, 1319 (1973) ("If applicants are correct on the merits they have standing as taxpayers. The case in that posture is in the class of those where standing and the merits are inextricably intertwined.").

In such cases, the court must look immediately to the merits despite the general rule that standing analysis precedes a merits inquiry. *Seaview Trading, LLC. v. Comm'r of Internal Revenue*, 858 F.3d 1281, 1287-88 (9th Cir. 2017) ("[B]ecause Seaview's merits argument … is inextricably intertwined with … standing … resolution of the merits question is necessary …."); *In re Majestic Star Casino, LLC*, 716 F.3d 736, 749 (3d Cir. 2013) ("We thus find ourselves in a circumstance where what is ordinarily the preliminary question of standing cannot be answered without delving into … the merits.").

In the present case, this Court cannot rule on the as-applied claims against the publication ban without first ruling on the speech mandate. Because Colorado has interpreted the speech mandate to compel Lorie's speech, Colorado has interpreted the publication ban to prevent Lorie from explaining what speech she can and cannot create. But Colorado can only ban Lorie's desired statement if Colorado can constitutionally force her to create those websites in the first place. So, while the district court found standing as to the publication ban challenge, it can only resolve that challenge by ruling on the validity of the speech mandate. Aplt. App. 372-76. In fact, Colorado has already conceded this point elsewhere. *See* Brief of Respondent Colorado Civil Rights Commission at 34-35, *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, No. 16-111, 2017 WL 4838416 (Oct. 23, 2017) (acknowledging that if Masterpiece has the right to decline to create cakes promoting same-sex marriages, it would have the right to display a sign to that effect).

The district court implicitly conceded this point as well when it ruled that a decision on the publication ban depends on resolution of *Masterpiece*, which raises only as-applied First Amendment challenges to the speech mandate and did not challenge the publication ban at all. Aplt. App. 375. In these circumstances, the speech mandate and publication ban require simultaneous review.

## II. The District Court Incorrectly Stayed This Case Based on *Masterpiece.*

This Court should proceed to the merits and reverse the district court's stay awaiting a decision in *Masterpiece.* Where "[j]urisdiction exist[s]," federal courts have a "virtually unflagging" duty to hear cases properly before them. *Sprint Commc'n, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013); *Mitchum*, 407 U.S. at 242 (holding that 41 U.S.C. § 1983's very purpose is "to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law"). Staying this case side-steps that duty.

The district court cited no case law in support of its decision to stay. And there is none, especially when Lorie suffers ongoing irreparable harm. *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) ("[T]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Additionally, abstentions and stays apply only in exceptional circumstances involving parallel cases. *Sprint Commc'n,* 134 S. Ct. at 591-94 (recognizing restrictions as to *Younger* abstention); *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (same as to *Rooker-Feldman* abstention); *Fox*, 16 F.3d at 1081 (same as to *Colorado River* abstention); *Landis v. N. Am. Co.*, 299 U.S. 248, 255-56 (1936) (same as to stays). Parallel cases have traditionally been understood as

two cases by the same litigants litigating the same issues in two different courts. *Id.* But Lorie's case and *Masterpiece* are not parallel cases; they involve different litigants.

While "[p]arallel cases" may sometimes include "substantially similar" litigants litigating "substantially similar" issues, that exception only applies in rare circumstances, such as when cases involve family members or employer/employee relationships. *D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1230-31 (10th Cir. 2004). That is not true here. Lorie and Phillips are not related by blood or employment. They engage in different mediums of expression and raise some different as-applied claims.

Even in cases involving "substantially similar" litigants, courts rarely issue a stay because the "balance" must be "heavily weighted in favor of … jurisdiction." *Fox*, 16 F.3d at 1082 (citation omitted); *see also Phelps v. Hamilton* (*Phelps I*), 59 F.3d 1058, 1069 (10th Cir. 1995) (stating that "it would be unfair to hold [a plaintiff's] constitutional rights hostage to the outcome and timing" of another person's state court proceeding).

This Court requires such a stay be supported by a "*strong showing of necessity.*" *Span-Eng Associates v. Weidner*, 771 F.2d 464, 468 (10th Cir. 1985) (emphasis in original). The "suppliant for a stay must make out a *clear case of hardship or inequity* in being required to go forward, if there is even a fair possibility that the stay … will work damage to

someone else." *Id.* (quoting *Landis*, 299 U.S. at 255) (emphasis in original). The mere fact that another court may rule on the same statute or some of the same issues does not justify delay.

The district court ignored this precedent, treating the two cases as parallel, when they are not, and ignoring the "strong showing of necessity" that weighs in favor of jurisdiction, not stay. Lorie incurs compounding irreparable harm each day she awaits an injunction. The district court dismissed this harm in two lines, denying any prejudice to Lorie because she has not begun creating custom wedding websites and has not alleged financial ruin if she delays in doing so. Aplt. App. 375. Yet, it is not Lorie's finances, but her constitutional rights that demand immediate relief. *Verlo*, 820 F.3d at 1127. And the district court found that Lorie was chilling those rights until she obtained a ruling. Aplt. App. 370-72. Under these circumstances the "clear case of hardship and inequity" lies against granting a stay, not for it.

This conclusion does not change just because the U.S. Supreme Court will decide *Masterpiece*. Every Supreme Court decision impacts other cases. But federal courts do not hold their dockets until the end of every Supreme Court term. "[T]he grant of certiorari alone is not enough to change the law of th[e] circuit or to justify … granting a stay … on the possibility that the Supreme Court may overturn circuit law." *Robinson v. Crosby*, 358 F.3d 1281, 1284 (11th Cir. 2004) (abrogated on other grounds).

In *Robinson v. Crosby*, the Eleventh Circuit declined a request to stay an execution pending a U.S. Supreme Court case that may have impacted the judgment. *Id.* If courts will not stay an execution pending a Supreme Court ruling, they certainly should not grant a stay that empowers Colorado to chill First Amendment freedoms. Indeed, the Eighth Circuit has already denied a motion to stay a similar case pending resolution of *Masterpiece. See* Order, *Telescope Media Group v. Lindsey*, No. 17-3352 (8th Cir. Dec. 6, 2017), Entry ID 4607441. This Court should do the same.

Finally, there is no practical reason for a stay now. The Supreme Court may issue its ruling in *Masterpiece* before this Court hears oral argument and decides Lorie's case. And this Court could always order supplemental briefing on the *Masterpiece* ruling once it comes. For this reason, this Court should simply proceed on its normal schedule and allow the parties to brief and argue this case. Only this schedule can accommodate the irreparable harm Lorie now faces.

## III. Lorie Deserves a Preliminary Injunction and Summary Judgment Against the Speech Mandate and Publication Ban.

To obtain a preliminary or permanent injunction, Lorie must show (1) likely merits success, (2) irreparable harm, (3) favorable balance of equities, and (4) an injunction consistent with the public interest. *Derma Pen, LLC v. 4EverYoung Ltd*, 773 F.3d 1117, 1119 (10th Cir. 2014)

(preliminary injunction); *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (permanent injunction).[3]

Lorie can satisfy each of these elements, starting with likely success, because CADA fails strict scrutiny for violating Lorie's free speech, free exercise, equal protection, and due process rights.

## A. The speech mandate deserves strict scrutiny because it compels speech as-applied.

CADA's speech mandate compels Lorie to create custom wedding websites (and graphics) that violate her religious beliefs if she creates custom wedding websites (and graphics) for one-man/one-woman weddings. This violates the compelled speech doctrine and triggers strict scrutiny. *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 19 (1986) (applying strict scrutiny to law compelling speech).

The First Amendment guarantees individuals "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). This latter right means the government cannot compel unwanted expression. Indeed, "the fundamental rule of protection under the First Amendment" is "that a

---

[3] While the Tenth Circuit applies a "heightened standard" for disfavored preliminary injunctions that require "affirmative action," Lorie does not seek such an injunction. *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1177 (10th Cir. 2003). Lorie seeks to preserve the status quo by stopping CADA's future enforcement against her. Moreover, First Amendment challenges satisfy the heightened standard. *Awad v. Zirax,* 670 F.3d 1111, 1131-32 (10th Cir. 2012).

speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 573.

In 2015, this Court specified three elements needed to prove a compelled speech claim: "(1) speech; (2) to which [plaintiff] objects; that is (3) compelled by some governmental action." *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (*Cressman II*) (citation omitted). Lorie can establish each element.

### 1. Lorie's websites and graphics are pure speech, protected by the First Amendment.

Lorie's custom wedding webpages, composed of words, graphics, and other forms of expression, are pure speech fully protected by the First Amendment. Aplt. App. 263, 268 (¶¶ 45-50, 81-82). Colorado has conceded this. *Id.* (¶¶ 46-47, 81) (stipulating that all of Plaintiffs' website and graphic designs are "expressive in nature, as they contain images, words, symbols, and other modes of expression that Plaintiffs use to communicate a particular message").

This Court's precedent confirms that concession. "The concept of pure speech is fairly capacious" and includes not just written or spoken words, but "music without words, dance, theater, movies, and pictures, paintings, drawings, and engravings," as well as "tattoos, the sale of original artwork, custom-painted clothing, and stained-glass windows." *Cressman II*, 798 F.3d at 952 (collecting cases) (internal quotations and

alterations omitted). Lorie's custom websites and graphics comfortably fit this description.

This conclusion does not change just because Lorie earns a living through her expression. The Supreme Court has protected businesses against compelled speech for over forty years. *See e.g.*, *Pac. Gas*, 475 U.S. at 5-6 (protecting for-profit electric company); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (protecting for-profit newspaper); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 791, 801 (1988) (protecting for-profit fundraisers). "[A] speaker is no less a speaker because he or she is paid to speak." *Id.* at 801; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("[T]he degree of First Amendment protection is not diminished merely because the [expression] is sold rather than given away."). Words and images do not stop being speech when their author receives a commission. The same principle extends to Lorie's commissioned websites.

> ### 2. Lorie objects to the message conveyed by custom websites and graphics promoting same-sex marriage.

For the second element of a compelled speech claim, Lorie must identify speech she objects to. She can easily do so: if Lorie creates custom wedding websites, Colorado requires her to create websites promoting same-sex marriage despite her objection to promoting that message. Aplt. App. 270 (¶¶ 94-96). In the context of pure speech like websites, that objection establishes a compelled speech claim no matter how third

parties interpret Lorie's websites. *See Cressman II*, 798 F.3d at 960-62 (suggesting that standard for compelled symbolic speech and pure speech differ in that "the interpretation of a third party" of the message conveyed would matter for compelling symbolic speech but not "if we were dealing with pure speech").

But in this case, third parties' interpretation bolsters Lorie's objection. Every viewer readily grasps the message conveyed through Lorie's wedding websites: a marriage will (or has) occurred and it should be celebrated. Indeed, Lorie's sample wedding website says exactly that: "You're Invited. Lily and Luke, Saturday November 17, 2017 … We invite you to celebrate our marriage." Aplt. App. 277-278. The message is unmistakable, and Lorie's religious beliefs do not permit her to convey it except for one man/one woman marriages. Aplt. App. 265-66, 269-70 (¶¶ 64-66, 91, 94).

This objection, however, does not turn on the sexual orientation of who requests websites or graphics from her. Lorie would not create a website celebrating same-sex marriage no matter who requested it. Aplt. App. 265-66 (¶¶ 64-66). Moreover, Lorie serves "all people regardless of classifications such as race, creed, sexual orientation, and gender." Aplt. App. 265 (¶ 64). She will "gladly create custom graphics and websites for [LGBT] clients or for organizations run by [LGBT] persons so long as the custom graphics and websites do not violate [her] religious beliefs, as is true for all customers," *Id.* (¶ 65). But Lorie cannot promote all messages

and all events, an objection that goes beyond the wedding context. Aplt. App. 266 (¶66) (Lorie also cannot, for example, create messages that contradict biblical truth, demean or disparage others, promote sexual immorality, support the destruction of unborn children, or incite violence).

In this way, Lorie's case falls directly in line with *Hurley*. In *Hurley*, the parade organizers "disclaim[ed] any intent to exclude homosexuals as such" and allowed individual members of the excluded LGBT group to march in the parade. 515 U.S. at 572-73. The organizers only objected to the LGBT group marching as a unit under its own banner, which altered the parade's message as a whole. *Id.* The Court therefore recognized that when speakers object to a message, not a person, public accommodation laws violate the First Amendment when forcing them to speak that objectionable message. *Id.*

Many other courts recognize this message/person distinction. *See, e.g., World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 258 (Utah 1994) (holding that newspaper did not discriminate by declining religious person's religious advertisement because newspaper "may discriminate on the basis of content even when content overlaps with a suspect classification…" so long as newspaper does not decline requests from protected class members "regardless of content …").

People of good faith can decline to convey messages celebrating same-sex weddings without discriminating against sexual orientation. To

equate the two—speech and status, disagreement and discrimination—marginalizes one particular viewpoint and imperils public debate about a vital issue (marriage) that "touch[es] the heart of the existing order." *Barnette*, 319 U.S. at 642. Following *Hurley*, this Court should also distinguish objections to persons and objections to messages. Lorie objects to the latter. The First Amendment protects her right to do so.

### 3. CADA compels Lorie to design and create objectionable websites and graphics.

Colorado will apply CADA to compel Lorie's speech. That much is crystal clear. Not once in this litigation has Colorado said otherwise. Rather, Colorado has repeatedly announced its enforcement intent. *See* Aplt. App. 270 (¶ 93) ("As a Colorado place of business engaged in sales to the public and offering services to the public, 303 Creative is a 'place of public accommodation' subject to CADA."); Defs.' MSJ Resp. 27-28 (characterizing Lorie's speech as "discriminat[ing] against same sex couples on the basis of [her] religious beliefs" in violation of CADA); Defs.' MPI Resp. 2, 6 (same). Given that CADA imposes severe penalties on violators, CADA compels Lorie to speak. *See* Aplt. App. 259-60, 310-39 (¶¶ 17, 25, Ex. C-F) (stating Colorado has the power to issue cease-and-desist orders and actions like mandated staff re-education training and reporting requirements).

Nor does this conclusion change just because CADA regulates conduct on its face. Throughout this litigation, Colorado has argued that

CADA *never* regulates speech and can only regulate discriminatory conduct. Defs.' MPI Resp. 14-15; Defs.' MSJ Resp. 9, 11-17. But that ignores the difference between facial and as-applied challenges and ignores the publication ban. To be sure, the speech mandate regulates conduct on its face and in most applications. But that does not answer whether the mandate compels speech when applied to Lorie's websites.

Thankfully, courts have already answered this question: generally applicable laws can unconstitutionally compel speech as-applied. As *Hurley* noted, while public accommodation laws "do not, as a general matter, violate the First or Fourteenth Amendments," such laws are invalid in application if they are *applied to* compel speech. *Hurley*, 515 U.S. at 572 (emphasis added); *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 640 (1994) ("[T]he enforcement of a generally applicable law may … be subject to heightened scrutiny" under the Free Speech Clause).

Lorie's case falls in line with these cases. Like the public accommodation law in *Hurley*, the speech mandate facially regulates conduct. Aplt. App. 256 (¶ 1). Yet, as-applied, the law compels Lorie to speak messages she would not otherwise speak. That violates the First Amendment. *See Hurley*, 515 U.S. at 574-75.

Nor can Colorado distinguish *Hurley* on the grounds that it involved a non-profit parade, rather than a for-profit business. Public accommodation laws frequently apply to non-profits. *See Roberts v.*

*United States Jaycees*, 468 U.S. 609, 612 (1984) (upholding application of public accommodation to non-profit organization). These laws become "peculiar" when they declare "speech itself to be the public accommodation." *Hurley*, 515 U.S. at 572-73. And that can occur regardless of corporate status. *Hurley* itself said that compelled speech protection is "enjoyed by business corporations generally" and "professional publishers" in particular. *Id.* at 574.

And it would be a strange First Amendment principle indeed that withdrew protection simply because speakers requested and received commissions. On that theory, most literary and artistic works throughout history would lose protection, and the government could compel the speech of everyone from Michelangelo to Jackson Pollock.[4] *See Baker v. Peddlers Task Force*, No. 96 Civ. 9472 (LMM), 1996 WL 741616, at *1 (S.D.N.Y. Dec. 30, 1996) ("The City cites no authority for the proposition that commissioned works are excluded from the protection of the First Amendment, and common sense and even a casual acquaintance with the history of the visual arts strongly suggest that a commissioned work is expression"). Such a dangerous rule has never been accepted.

---

[4] *See* Tanya Singh, A History of Art Commissions (April 22, 2017), https://www.art-mine.com/collectorscorner/history-art-commissions/ (discussing history of commissioned artwork).

**4. Compelling Lorie to create websites and graphics promoting same-sex marriage compels speech based on content and viewpoint.**

Although Lorie has satisfied this Court's three part test for establishing compelled speech, the speech mandate goes beyond this test and compels speech in a particularly egregious way: based on content and viewpoint. It does so in three equally improper ways.

First, the mandate compels Lorie to convey a message with certain content—recognizing and celebrating same-sex marriage—that she would not otherwise convey. As the Supreme Court has noted, "[m]andating speech that a speaker would not otherwise make necessarily alters the content" and constitutes "a content-based regulation of speech." *Riley*, 487 U.S. at 795.

Second, the mandate only applies to Lorie if she conveys particular content elsewhere. If Lorie's websites stick to promoting recycling or discussing dishwasher detergent, she is safe. Only if Lorie creates websites promoting opposite-sex marriage must she create websites promoting same-sex marriage.

In this way, the mandate is triggered by the content of the speech Lorie creates earlier. And when a law is triggered by the content of speech elsewhere, that law is content-based. *See Pac. Gas*, 475 U.S. at 13-14 (plurality) (explaining how law regulates based on content if "it was triggered by a particular category of … speech" or has "conditioned [access] on any particular expression" conveyed earlier); *Tornillo*, 418

U.S. at 256 (concluding that statute "exacts a penalty on the basis of the content of a newspaper" because statute only required newspapers to print an editorial if they print editorials with particular content earlier).

Third, the mandate awards access to Lorie's websites only to particular viewpoints she disagrees with. If Lorie creates websites promoting opposite-sex marriage, the mandate does not require Lorie to create websites advocating child safety locks or immigration reform. When Lorie creates websites promoting opposite-sex marriage, the mandate *only* requires Lorie to create websites promoting same-sex marriage, the exact opposite viewpoint of what she wants to convey. In this way, the mandate is viewpoint-based because it awards "access … only to those who disagree with [Lorie's] views." *Pac. Gas*, 475 U.S. at 14 (finding order content-based because it required electric company to open its newsletter only to advocacy group that favored utility regulation, thereby forcing company "to help disseminate hostile views" which did "not equally constrain both sides of the debate about utility regulation"). This viewpoint- and content-based application is another reason the speech mandate must overcome strict scrutiny.

### 5. Compelling Lorie to create websites and graphics creates a dangerous and limitless principle.

Forcing Lorie to create objectionable messages about marriage if she speaks about marriage at all sets a dangerous precedent. It empowers governments to compel any commissioned speaker to speak any

objectionable message regardless of the speaker's beliefs or views. Such power guts the compelled-speech doctrine.

The broad nature of public accommodation laws themselves makes this true. These laws have greatly expanded over time, enlarging both the definition of public accommodation and the number of protected classifications. *Boy Scouts of America v. Dale*, 530 U.S. 640, 656-57 n.2 (2000) (discussing this expansion and recognizing that "the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased"). Many public accommodation laws cover just about anyone who offers anything to the general public, and some even make political ideology a protected class.[5]

Yet Colorado wishes to give public accommodation laws a blank check: the power to compel any commissioned speech so long as they deem it to touch on a protected class. That means, under Colorado's theory, CADA could compel:

- an African American sculptor to create crosses for an Aryan Nation Church rally;

- an atheist singer to sing hymns at a Catholic Easter service;

---

[5] Eugene Volokh, Printing Business's Right Not to Print Messages it Doesn't Want to Print, (Nov. 2, 2015), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/11/02/printing-businesss-right-not-to-print-messages-it-doesnt-want-to-print/?utm_term=.deca2442619c (identifying 13 public accommodation laws that protect political ideology).

- a Muslim printer to print a synagogue's pro-Israel pamphlets;

- a lesbian web designer to create an Orthodox Jewish website criticizing same-sex marriage;

- a law firm to represent the Westboro Baptist Church in their effort to gain a permit to protest a NAACP event.

And if Colorado (or any other jurisdiction) adds political ideology as a protected class, Colorado's theory would compel:

- a Democratic speechwriter to write speeches for Republican candidates;

- a Latino American publisher to print promotional material for the Klu Klux Klan;

- a pro-choice photographer to photograph a pro-life rally for use in pro-life voter guides.

Just in Lorie's case, CADA would compel her to write "You're Invited. Bill and Luke … invite you to celebrate our marriage" followed by, "For this reason a man shall leave his father and his mother and be joined to his wife: and they shall become one flesh." Genesis 2:24." App. 281 (stating same for Luke and Lily).

Forcing an individual to write text—in this case sacred scripture—to convey messages they consider sacrilegious is an egregious form of compelled speech that harkens back to *Barnette,* 319 U.S. at 642 (holding that Jehovah's witnesses could not be forced to recite pledge of allegiance because "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, [or] religion"). To "force citizens to confess by word or act" that which is not in their hearts is an affront to individual

liberty and dignity. *See id.* No one should suffer this harm. And no legal theory should allow it.

### B. The publication ban deserves strict scrutiny because it bans speech based on content and viewpoint, facially and as-applied.

Just as the government cannot compel speech, it also cannot regulate speech based on "its message, its ideas, its subject matter, or its content" without satisfying strict scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

A law is content-based if it "'on its face' draws distinctions based on the message a speaker conveys" or it "cannot be 'justified without reference to the content of the regulated speech' ...." *Id.* at 2227 (citation omitted). A law is viewpoint-based "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 829.

The publication ban is both content- and viewpoint-based. Facially, the ban prohibits "publish[ing] … any … communication" that "indicates" (1) "that … services … of a place of public accommodation will be refused" or (2) "that an individual's patronage or presence … is unwelcome, objectionable, unacceptable, or undesirable because of … sexual orientation" or a host of other characteristics. Colo. Rev. Stat. § 24-34-601(2)(a). This text forbids communications that reference particular content (sexual orientation), but the text allows communications

referencing non-enumerated characteristics (like clothing or appearance).

Even worse, the provision only bans particular views on certain topics. For example, the ban forbids communications that indicate a person is unacceptable because of her sexual orientation but allows communications that indicate a person is acceptable because of her sexual orientation. In effect, the law prevents speakers from criticizing the beliefs, messages, organizations, and choices affiliated with certain protected classes.

Courts have found similar laws to be content- and viewpoint-based. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-396 (1992) (finding law content- and viewpoint-based because it banned "fighting words" that insult or provoke violence on the basis of enumerated characteristics); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (plurality) (invalidating ban on registering trademarks that disparage persons because "[g]iving offense is a viewpoint"); *Campbell v. Robb*, 162 F. App'x 460, 468 (6th Cir. 2006) (finding publication ban in Fair Housing Act to be content-based).[6]

---

[6] Although *Campbell* and other cases have upheld narrower content-based publication bans, those cases evaluated bans on statements initiating illegal conduct, i.e., an employer posts a "White Applicants Only" sign. *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006). In contrast, Lorie's desired statement does not commence illegal conduct (refusing to hire someone) but explains her religious beliefs on marriage and her desire not to convey contrary views, both of which are constitutionally protected.

As-applied to Lorie, the publication ban also regulates speech based on content and viewpoint. As Colorado conceded below, the ban forbids Lorie from publishing her desired statement discussing her religious beliefs about marriage and her business because it would make someone feel "unwelcome, objectionable, unacceptable, or undesirable" on the basis of sexual orientation. Defs.' MPI Resp. 18 (characterizing the belief that marriage is a union between one man and one woman as a "derogatory, offensive message"). Colorado can only reach that conclusion by looking at the content of Lorie's statement (it discusses marriage) and the viewpoint it advances (it could offend someone who supports same-sex marriage). When the government singles out and bans speech on one side of an important topic like marriage, the government must overcome strict scrutiny.

### C. The speech mandate and publication ban deserve strict scrutiny because they violate Lorie's free exercise rights as-applied.

Lorie believes marriage "is by its nature a gender-differentiated union of man and woman" ordained by God. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594 (2015). This belief has long "been held–and continues to be held—in good faith by reasonable and sincere people here and throughout the world." *Id.* Equally important, Lorie believes she should proclaim and explain her religious beliefs about marriage to others. Aplt. App. 267-68 (¶¶ 71-80). As a result, Lorie cannot create messages celebrating same-sex marriage or decline to use her creative talents to

celebrate opposite-sex marriage without violating her faith. Aplt. App. 265-66 (¶ 60-66). But CADA requires Lorie to do exactly this.

This treatment violates the Free Exercise Clause because of its hostility toward one particular religious view. While courts often uphold neutral and generally applicable laws, they apply strict scrutiny to laws hostile towards religion—either facially or as-applied. For example, in *Lukumi*, the Court overturned a facially neutral law that in application created a "religious gerrymander[ ]" to suppress a particular disfavored religious ritual. 508 U.S. at 534. Colorado's application of CADA raises similar concerns.

For one, Colorado has not applied CADA neutrally. Colorado has created a "religious gerrymander" to suppress the disfavored religious belief that marriage is between one man and one woman. *Id.* This inconsistency takes center stage with Colorado's inconsistent applications of CADA: Masterpiece and Lorie on one hand, and Azucar Bakery, Le Bakery Sensual, and Gateaux on the other. Defs.' MPI Resp. 2, 6, 18; Aplt. App. 260-61, 310-63 (¶¶ 24-28, Ex. C-L).

The latter three bakeries declined requests by a Christian to create cakes with a bible image and bible verses critical of same-sex marriage. Aplt. App. 261, 340-63 (¶¶ 28, Ex. G-L). Before the Commission, these bakeries claimed to serve everyone, including Christians, but could not create the religious messages criticizing same-sex marriage because they

found them offensive. *Id.* On that basis, Colorado dismissed creed discrimination complaints against all three bakeries.

But when Masterpiece claimed to serve everyone, including LGBT people, yet declined to create a cake celebrating same-sex marriage because the cake's message violated the owner's religious beliefs, Colorado reached the opposite conclusion. Aplt. App. 260-61, 310-39 (¶¶ 24-27, Ex. C-F).

So the three bakeries had a blanket policy of not conveying messages critical of same-sex marriage no matter who requested that message and won; Masterpiece had a blanket policy of not conveying messages celebrating same-sex marriage no matter who requested that message and lost. As this inconsistency shows, Colorado artists who support same-sex marriage may decline to oppose it, while those who oppose same-sex marriage must support it. Aplt. App. 260-61, 310-63 (¶¶ 24-28, Ex. C-L). Colorado's prior applications also show that people of faith who hold the belief in one man, one woman marriage always lose. *Id.* This inconsistent treatment "single[s] out" a specific religious belief "for discriminatory treatment." *Lukumi*, 508 U.S. at 538.

This favoritism can occur because Colorado uses a system of individualized assessments and exemptions to enforce CADA. This too lacks neutrality. *Id.* at 537 (condemning law enforced through "individualized governmental assessment of the reasons for the [allegedly unlawful] conduct" because individualized assessments too

easily target religious beliefs in application). Colorado employs an individual assessment to adjudicate public accommodation complaints: Colorado deems some reasons for declining a request acceptable (as with the three bakeries), and some not (as with Lorie), based on the "offensiveness" of the requested speech. Aplt. App. 260-61, 310-63 (¶¶ 24-28, Ex. C-L). This vague standard gives Colorado leeway to "devalue[] religious reasons" for declining to create speech. *Lukumi*, 508 U.S. at 537.

This leeway is especially concerning because those responsible for applying CADA have acted and spoken in ways indicating animus against religious persons who disagree with same-sex marriage. *See* Aplt. App. 254 (commissioner stating "[f]reedom of religion and religion has been used to justify all kinds of discrimination throughout history … And to me it is one of the most despicable pieces of rhetoric that people can use…"); Aplt. App. 260-61, 310-39 (¶¶ 24-27, Ex. C-F) (order compelling Phillips to create objectionable speech, train his staff that his beliefs are discriminatory, and comply with onerous reporting requirements because Phillips declined to create message promoting same-sex marriage).

The Commission or its commissioners have never disavowed those statements or attempted to remove the taint created when anti-religious statements issue from enforcement officials. *See Felix v. City of Bloomfield*, 841 F.3d 848, 863 (10th Cir. 2016) (requiring action to purposeful, public, and equally persuasive to remove taint of prior First Amendment violation). Once this anti-religious animus joins CADA's

discretionary system of individual assessments, Lorie has no hope of a fair shake. The system is not neutral.

Moving from neutrality to general applicability, CADA fails because it categorically exempts others based on religious beliefs but not Lorie. This under-inclusiveness is fatal. *See Lukumi,* 508 U.S. at 543. (noting "that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief…").

For example, Colorado claims that it enforces CADA to stop the dignitary harm caused when a public accommodation declines an expressive project. But this harm also occurs in the complaints against the three bakeries as with Masterpiece or Lorie. Despite this fact, Colorado exempts artists who support same-sex marriage from the law but applies the law against those who do not support same-sex marriage on religious grounds. In other words, CADA is not generally applied to serve its stated purpose. That triggers strict scrutiny.

CADA also triggers strict scrutiny under the hybrid-rights doctrine. *See Axson-Flynn*, 356 F.3d at 1295-97 (recognizing hybrid-rights where university officials pressured theatre student to use offensive language in her performances despite her religious objection). Under this doctrine, strict scrutiny applies where a "colorable" free exercise claim is linked with "other constitutional protections, such as freedom of speech." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881-82 (citing

*Wooley* and *Barnette* as examples because both cases implicated "freedom of religion" and "compelled expression").

Lorie meets this standard because she has already shown that CADA compels and restricts her speech. *See supra* § III.A-B. That makes her claims far more than just colorable and triggers strict scrutiny under the hybrid-rights doctrine.

**D.  The speech mandate and publication ban deserve strict scrutiny because they violate equal protection as-applied.**

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Distinctions among similarly situated groups that affect fundamental rights receive "the most exacting scrutiny," *Clark v. Jeter*, 486 U.S. 456, 461 (1988), and discriminatory intent is presumed, *see Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) ("[W]e have treated as presumptively invidious those classifications that … impinge upon the exercise of a 'fundamental right.'"). Because Colorado's application of CADA impinges Lorie's fundamental rights like her rights to free speech and free exercise, discriminatory intent is presumed.

Again, Colorado's treatment of the four bakeries described above is dispositive. Those bakeries were similarly situated. They were investigated after individuals protected by CADA filed complaints against them. The bakeries served everyone but declined the requested

49

cakes because they conveyed unwanted messages. Yet, Colorado found only Masterpiece guilty of violating CADA. And Colorado treats Lorie just like Masterpiece. This disparate application impinges Lorie's free speech and free exercise rights. *See supra* § III.A-C. It is unequal treatment.

**E. The speech mandate and publication ban deserve strict scrutiny because they violate the unconstitutional conditions doctrine as-applied.**

The government "may not deny a benefit to a person on a basis that infringes [her] constitutionally protected interests–especially [her] interest in freedom of speech." *Perry,* 408 U.S. at 597. To allow this "would in effect … penalize[] and inhibit[]" these freedoms by letting the government "produce a result" indirectly that it "could not command directly." *Id.* at 597.

Under the First Amendment, the state cannot compel speech. *See* § III.A. Yet Colorado uses CADA to condition Lorie's entry into the wedding industry on her willingness to forgo her constitutional rights. Lorie may only obtain the benefit of operating her family business free from government punishment if she agrees to create unwanted speech and stay silent about her religious beliefs about marriage. Aplt. App. 260, 270 (¶¶ 24-25, 95-98). Colorado cannot require either directly. Neither may it do so indirectly.

**F.   The speech mandate and publication ban fail strict scrutiny.**

Because Colorado's enforcement of CADA violates Lorie's constitutional rights, this application must satisfy strict scrutiny—the "most demanding test known to constitutional law." *City of Boerne*, 521 U.S. at 509.

To satisfy this test, Colorado must show that CADA's application to Lorie narrowly serves a compelling state interest. *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008). This proof must be particularized, meaning "curtailment of free speech must be actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011). Colorado may not cite "broadly formulated interests justifying the general applicability of [the] government mandates." *O Centro*, 546 U.S. at 430-31. Thus, "[i]t is the rare case in which … a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992).

Applying CADA to Lorie should be no exception because Colorado has no compelling interest to control Lorie's speech. Nor can Colorado cite discrimination as a basis for doing so because Lorie does not discriminate against anyone; she merely declines to convey messages she disagrees with. Colorado can apply CADA to stop discriminatory conduct without compelling Lorie to speak objectionable messages. Public accommodation laws do not serve a compelling, much less legitimate, interest when they compel speech. *See, e.g.*, *Dale*, 530 U.S. at 656 (concluding that "state interests embodied in … [the] public accommodations law do not justify

… intrusion on [First Amendment rights]"); *Hurley*, 515 U.S. at 578-79 (ruling that applying a public accommodation law to compel speech and to "produce a society free of the corresponding biases" is a "decidedly fatal objective"). Indeed, the Supreme Court has *never* found a compelling interest to justify forcing an individual to speak a political or religious message to which they object.

Colorado's application of CADA also fails to serve a compelling interest because others are willing to create websites Lorie cannot. Aplt. App. 270-71 (¶¶ 99-101). For example, one online directory lists 245 web design companies in Denver alone, while another site lists over 5,000 nationally. *Id.* Many website designers will also create websites promoting same-sex marriage. *See, e.g.,* Gay + Lesbian Weddings, The Knot, https://www.theknot.com/gay-lesbian-weddings (last visited Dec. 15, 2017); Wedding Lovely Blog, (Nov. 17, 2017), https://weddinglovely.com/blog/top-five-wedding-website-builders/. When so many others willingly create these websites, forcing Lorie to do so makes little sense.

Turning to the second prong of the strict scrutiny test, CADA's application lacks narrow tailoring in numerous ways. For one, this application is under-inclusive. The law exempts those who support same-sex marriage despite the dignity harm to customers that Colorado allegedly seeks to protect. *See supra* § III.C.

For another, Colorado could use less restrictive alternatives to achieve any legitimate goal. For example, Colorado could track the federal public accommodation law and not apply CADA to expressive businesses. 42 U.S.C. § 2000b (defining public accommodations narrowly to apply to hotels, restaurants, theaters). Or Colorado could interpret CADA to not apply to inherently selective businesses, like an expressive business that accepts projects based on numerous artistic and moral factors. *Vejo v. Portland Pub. Sch.*, 204 F. Supp. 3d 1149, 1168 (D. Or. 2016) (interpreting states' cases to conclude that university program was too selective to constitute a public accommodation).

Lastly, Colorado could interpret CADA not to apply to expressive businesses when they make expressive classifications necessary to the normal operation of their business. Title VII already does this. *See* 42 U.S.C. § 2000e-2(e)(1) (permitting classifications that are "reasonably necessary to the normal operation of that particular business or enterprise"); 29 C.F.R. § 1604.2 (interpreting Title VII bona fide occupational qualification to allow production studios to make sex classifications when "necessary for the purpose of authenticity or genuineness … e.g., [selecting] an actor or actress"). In other words, Colorado could simply interpret CADA to comply with the First Amendment: allow businesses to make message-based judgments yet still restrict status-based discrimination. *See World Peace Movement*, 879

P.2d at 258 (adopting this interpretation for Utah's public accommodation law).

As these alternatives show, Colorado can achieve its legitimate goals without punishing constitutional freedoms. Colorado should do so.

### G. The publication ban is vague, overbroad, and allows unbridled discretion.

The publication ban prohibits speech if Colorado deems it to indicate someone is "unwelcome, objectionable, unacceptable, or undesirable" based on a protected characteristic. Colo. Rev. Stat. § 24-34-601(2)(a). This language is vague and overbroad, and it grants unbridled discretion to enforcement officials.

*Vagueness.* The Due Process Clause forbids statutory language that fails to give a person of ordinary intelligence an understanding of what the law prohibits and what it allows. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). It also requires the "legislature [to] establish minimal guidelines to govern law enforcement." *Id.* at 358.

The second clause of CADA's publication ban fails this standard. It forbids communications that indicate someone is "unwelcome, objectionable, unacceptable, and undesirable." Colo. Rev. Stat. § 24-34-601(2)(a). But nothing defines this innately subjective language. What is unwelcoming to one person may be welcoming to another. What is objectionable to one person may not be to another. Colorado has taken this subjectivity and used it to regulate speech deemed offensive.

Viewpoint-based restrictions on offensive speech cannot withstand strict scrutiny. *Tam*, 137 S. Ct. at 1764. Thus, the publication ban is unconstitutionally vague because it allows Colorado to favor some viewpoints over others as Colorado has done.

*Overbreadth.* For much the same reasons, the publication ban is overbroad. A statute is overbroad when a "substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens,* 559 U.S. 460, 473 (2010). As other courts have confirmed, the problematic language in CADA's publication ban is fatally overbroad. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (invalidating harassment policy as overbroad because it banned "any unwelcome verbal … conduct which offends … because of" protected characteristics); *Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67, 77-80 (D.D.C. 2001) (invalidating policy on "objectionable" appearance as overbroad). *Cf. Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 577-78 (6th Cir. 2013) (refusing to interpret Fair Housing publication ban to prohibit statements that "'discourage' an ordinary reader of a protected class" because "using 'discourage' could create First Amendment concerns by creating an overly broad restriction on speech").

This overbreadth problem is illustrated by public accommodation laws like the one in Oregon which has been used to punish a business unwilling to celebrate same-sex weddings for posting a sign that stated

"This fight is not over. We will continue to stand strong." *In re Melissa & Aaron Klein dba Sweetcakes by Melissa*, Case Nos. 44-14 and 45-14, 2015 WL 4868796, at *11 (Or. BOLI July 2, 2015). That sign did not even advertise an intent to decline a project or service. Yet, it triggered enforcement.

CADA's language is much broader than Oregon's law and its vague terms require the same result. But a law that bans creative professionals wholesale from stating their beliefs on marriage or their intent to "stand strong" for those beliefs cannot be constitutional in a substantial number of applications.

*Unbridled Discretion.* A law violates the unbridled discretion doctrine if it (1) "delegate[s] overly broad … discretion to a government official" or (2) "allows arbitrary application," because "such discretion has the potential for becoming a means of suppressing a particular point of view." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). The publication ban does both. Its broad and undefined terms grant enforcement officials unbridled discretion to punish speech critical of same-sex marriage while upholding speech that supports it. This kind of arbitrary enforcement power is facially unconstitutional.

## H. Lorie satisfies the remaining factors to obtain a preliminary and permanent injunction.

Because Lorie has established success on the merits of her claims, she can easily meet the remaining factors for injunctive relief:

irreparable harm, a favorable balance of the equities, and an injunction not adverse to the public interest.

As to harm, Lorie is suffering ongoing irreparable harm since CADA is chilling her constitutional rights. *Verlo*, 820 F.3d at 1129 ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

As to the equities, the balance favors Lorie since the equities favor vindicating constitutional rights. *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) ("The threatened injury to Plaintiffs' constitutionally protected speech outweighs whatever damage … may [be] cause[d] [by] Defendants' inability to enforce what appears to be an unconstitutional statute."). And as to public interest, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo*, 820 F.3d at 1132. That is particularly true for First Amendment freedoms which help protect "the free expression of … millions." *Johnson*, 194 F.3d at 1163.

## Conclusion

Colorado wants to force Lorie to utter what is not in her mind or in her heart and punish her if she speaks as her faith requires. While Colorado may achieve commendable goals through most CADA applications, it does not do so here. Colorado can do so without compelling or banning Lorie's speech. CADA and free speech can co-exist. CADA

should be applied to regulate status discrimination, not speaker autonomy. Because CADA has been applied to the latter, Lorie respectfully asks this Court to reverse, instructing the lower court to award a preliminary and permanent injunction and summary judgment that protects Lorie's constitutional freedoms.

## Oral Argument Statement

Lorie respectfully requests that the Court hear oral argument in this matter. This case involves important and complex First Amendment issues that greatly impact Lorie's constitutional rights as well as the constitutional rights of other business owners in Colorado. Oral argument will materially assist the Court in deciding these issues.


Dated: December 18, 2017

Respectfully submitted,

<u>s/ Jonathan A. Scruggs</u>

Kristen K. Waggoner
Jonathan A. Scruggs
Katherine L. Anderson
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kwaggoner@ADFlegal.org
jscruggs@ADFlegal.org
kanderson@ADFlegal.org

David A. Cortman
Rory T. Gray
Alliance Defending Freedom
1000 Hurricane Shoals Rd., NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Michael L. Francisco
MRD Law
3301 West Clyde Place
Denver, CO 80211
(303) 325-7843
michael.francisco@mrd.law

*Attorneys for 303 Creative LLC and Lorie Smith*

**Certificate Of Compliance With Rule 32(A)**
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point proportionally spaced Century Schoolbook typeface using Microsoft Word 2013.

Date: December 18, 2017          s/ Jonathan A. Scruggs
                                 Jonathan A. Scruggs

# Certificate Of Digital Submission

1.      I hereby certify that all required privacy redactions have been made.

2.      I hereby certify that hard copies of the foregoing Appellants' Opening Brief will be submitted to the Court pursuant to 10th Cir. R. 31.5 and will be exact copies of the version submitted electronically via the court's ECF system.

3.      I hereby certify that this document has been scanned for viruses with the most recent version of a commercial virus scanning program, Traps Advanced Endpoint Protection, Version 4.1.2, and is free of viruses according to that program.

Date: December 18, 2017      <u>s/ Jonathan A. Scruggs</u>
                                      Jonathan A. Scruggs

# Certificate Of Service

I hereby certify that on December 18, 2017, a true and accurate copy of this brief and addenda was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

Vincent E. Morscher
Deputy Attorney General
Office of the Colorado Attorney General
Civil Litigation & Employment Law Section
vincent.morscher@coag.gov


Skippere Spear
Senior Assistant Attorney General
Office of the Colorado Attorney General
Civil Litigation & Employment Law Section
skip.spear@coag.gov


Jack D. Patten, III
Assistant Attorney General
Civil Litigation and Employment Law Section
jack.patten@coag.gov

*Attorneys for Defendants-Appellees*


Date: December 18, 2017        s/ Jonathan A. Scruggs
                               Jonathan A. Scruggs